1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TONY ALLEN, JR.,

11              Petitioner,                    No. CIV S-06-1923 FCD DAD P

12        vs.

13   MARK SHEPARD,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding with a second amended petition for a writ

17   of habeas corpus pursuant to 28 U.S.C. § 2254.[1]  Petitioner is represented in these proceedings by

18   attorney Efren Williams.  The second amended habeas petition before the court challenges

19   petitioner's 2001 conviction in the Sacramento County Superior Court for second degree murder

20   (Cal. Penal Code § 187(a)) with a use of a firearm (Cal. Penal Code § 12022.53(b)-(d)).

21   Petitioner seeks relief on the grounds that: (1) his trial counsel rendered ineffective assistance;

22   (2) the evidence presented at his trial was insufficient to support the verdict; (3) he was denied

23   _____

24          [1]  Petitioner filed a second amended petition for a writ of habeas corpus on September 23,
     2007.  On April 14, 2008, the court signed a stipulation and order granting petitioner leave to file
25   an indexed table of contents and table of authorities which were not included with his second
     amended petition.  On April 17, 2008, petitioner re-filed his second amended petition, which
26   included his table of contents and table of authorities.  See Doc. No. 45 (Second Am. Pet.) at 39-
     43.

                                                  1

the right to a fair trial because the trial judge was biased against him; and (4) his rights to due

process and a fair trial were violated by prosecutor's failure to disclose exculpatory evidence to

the defense.  Upon careful consideration of the record and the applicable law, the undersigned

will recommend that petitioner's application for habeas corpus relief be denied.

BACKGROUND

In its unpublished memorandum and opinion affirming petitioner's judgment of

conviction on appeal[2], the California Court of Appeal for the Third Appellate District provided

the following factual summary:

> The incident that gave rise to the charges occurred on January 30,
> 1999.  At that time, defendant was married to two women.[3]  He had
> married Deborah 10 or 12 years before.  At some time, he began
> living in Denver, Colorado, and then married Lateshia in 1997.
> Although defendant lived in Denver most of the time, it appears
> that when he visited Sacramento, he expected to enjoy the benefits
> of his marriage to Deborah.
>
> During 1998, neither wife enjoyed the benefits of defendant's
> company because he was incarcerated on a parole violation.
> During that time, Deborah formed a romantic relationship with the
> victim, David Bell.  And she decided to dissolve her marriage to
> defendant.
>
> Defendant was released from incarceration in December 1998, and
> sometime around the beginning of 1999, Deborah told him that she
> was proceeding with a dissolution action.  Defendant replied that a
> dissolution was just a piece of paper and that she would still be his
> wife.  Bell wanted Deborah to tell defendant about their
> relationship.  However, Deborah did not want defendant to find
> them together.
>
> On the day before the murder, Bell accompanied Deborah while
> she made the payment for her dissolution.  The day of the murder,
> Bell and Deborah spent the morning together.  The day before,
> defendant flew from Denver to Sacramento to pick up his Ford
> Expedition, which had been left in Sacramento for automotive

---

[2]  Notice of Lodging Documents on May 12, 2008 (Doc. No. 54), Resp't's Lod. Doc. 4
(hereinafter Opinion).

[3]  Defendant's wives sometimes used the last name Allen and other times used different
names.  For convenience and to avoid confusion, we will refer to them by their first names,
Deborah and Lateshia.

2

work.  While Deborah was out with Bell, her daughter called to advise that defendant was in town and had called.  Bell wanted to find defendant to tell him that he and Deborah were together, but Deborah refused.  Eventually, Bell left Deborah at her house and said he was going to Oakland and would see her later.

Some time after Bell left, defendant called and said he was coming to visit.  Deborah told him she wanted him to take his possessions out of her house.  Defendant visited Deborah that evening and stayed for several hours.  Bell called and let Deborah know he was aware defendant was there.  Bell wanted to talk to defendant, but Deborah refused.  Bell told Deborah that she should tell defendant they were together or should stop seeing him, although his language was more colorful, and hung up.  Moments later, Bell called back and defendant answered.  After a short conversation, defendant hung up.  He then left the house.

Bell drove to Deborah's house and parked on the street.  After he got out of his car, he was shot.  Most of the neighbors reported hearing three shots, and there were three expended shell casings found in front of Deborah's house.  Bell was hit with two shots, one to the right side of his rib cage and one to the face.  The shot to the face was the more serious wound.  The bullet shattered teeth, passed through the tongue, and lodged in the neck, where it damaged the internal carotid artery.

Bell left a trail of blood while he went down the street seeking assistance.  Bell received help from a neighbor who called 9-1-1.  While they waited for emergency personnel to arrive, the operator asked what happened.  Bell said he was shot by defendant, gave a brief description of the perpetrator and the location of the shooting, and said it was over a girl.  He repeated these statements to the first police officer who arrived on the scene.  Bell was taken to the hospital for emergency surgery.  He survived for about two weeks until the attempted repairs to his carotid artery failed and he died.

After the shooting, defendant returned to Denver, where he obtained a driver's license and began living under the name of Antoine Holley.  Denver police eventually learned that defendant was using the name Antoine Holley and began looking for him under that name.  Defendant returned to Sacramento and was later arrested.

Initially, Deborah was cooperative with police investigators and made many statements implicating defendant in the murder.  Deborah followed through on her dissolution action, and the marriage was dissolved on July 5, 2000.  But as the proceedings progressed, Deborah and defendant reconciled.  Deborah sought to avoid testifying and, obviously to that end, remarried defendant on July 19, 2001.  Her testimony was replete with instances in which she testified contrary to her earlier statements, either denied or

1    claimed not to remember her earlier statements, and asserted that
     the police investigators intimidated her and she was just telling
2    them what they wanted to hear.  Many of Deborah's earlier
     statements were admitted as prior inconsistent statements.  (Evid.
3    Code, § 1235.)

4    (Opinion at 2-4.)[4]

5            After he was convicted, petitioner retained new counsel, who filed a motion for

6    new trial arguing that petitioner's trial counsel had rendered ineffective assistance.  The trial

7    court took testimony and evidence and resolved those claims adversely to petitioner, denying the

8    motion for a new trial.  (Reporter's Transcript on Appeal (RT) at 2825.)

9            Petitioner's judgment of conviction was affirmed by the California Court of

10   Appeal for the Third Appellate District.  (Resp't's Lod. Doc. 4.)  On April 14, 2004 petitioner's

11   Petition for Review was summarily denied by the California Supreme Court.  (Resp't's Lod.

12   Doc. 6.)  Petitioner filed pro se habeas petitions in state court in which he raised claims relating

13   only to the alleged bias of the trial judge and the claimed Brady violation.  (Resp't's Lod. Docs.

14   7, 9 & 11.)  Those petitions were all denied, culminating with the California Supreme Court's

15   summary denial of habeas relief on July 26, 2006.  (Resp't's Lod. Doc. 8, 10, & 12.)

16           On May 30, 2006, Rick von Geldern executed a declaration in which he stated

17   that he was the private investigator retained by petitioner's trial counsel to work on petitioner's

18   case.  (See Resp't's Lod. Doc. 13, Ex. 1.)  Mr. von Geldern related in his declaration, among

19   other things, some of the trial investigation he conducted in the case, investigation he did not

20   conduct, and directions he had received from petitioner's trial counsel.  (Id.)  Petitioner's current

21   counsel in these federal habeas proceedings has represented that petitioner received the von

22   Geldern declaration sometime in 2006, at around the same time current habeas counsel was being

23   retained.

24

25          [4] On February 15, 2001, petitioner's first jury trial commenced.  (Second Am. Pet. at 10.)
     A mistrial was declared after a prosecution witness gave testimony that included prejudicial
26   inadmissible hearsay.  (Id.)  Petitioner's retrial commenced in April, 2001.  (Id.)

                                                4

1       On August 25, 2006, petitioner's counsel filed a petition for writ of habeas corpus

2   with this court which included several admittedly unexhausted claims, including claims of

3   ineffective assistance of trial counsel and insufficiency of the evidence based, at least in part,

4   upon the then-recently received von Geldern declaration.  (Doc. No. 1.)  On November 1, 2006,

5   prior to the filing of a response, petitioner's counsel filed a first amended habeas petition

6   expounding on his unexhausted claims.  (Doc. No. 10.)  In the first amended petition, counsel

7   made clear that petitioner's unexhausted ineffective assistance of counsel claim included the

8   allegation that his trial counsel was deficient for not having adequately investigated potential

9   defenses based on both alibi and self-defense.  (Id. at 12-18.)  In addition, that petition spelled

10  out petitioner's claim that his trial counsel was ineffective in failing to utilize an independent

11  forensic pathologist as a defense expert witness.  (Id. at 18-23.)  Finally, the amended petition

12  included the unexhausted claim that there was insufficient evidence introduced at petitioner's

13  trial with respect to the cause of death of the victim to support petitioner's murder conviction.

14      On November 27, 2006, in light of the statement of non-opposition filed by

15  respondent, this court granted petitioner's request for stay and abeyance to permit him the

16  opportunity to exhaust the admittedly unexhausted claims noted above before the California

17  Supreme Court.  (Doc. No. 12.)  On December 23, 2006, counsel filed an exhaustion petition on

18  petitioner's behalf with the California Supreme Court.  (Resp't's Lod. Doc. 13.)  The petition

19  filed with the California Supreme Court set forth all of the new, unexhausted claims referred to

20  above, included as Exhibit 1 the von Geldern declaration, and requested that the California

21  Supreme Court order an evidentiary hearing in connection with those claims.  (Id.)  The

22  California Supreme Court denied the exhaustion petition, without conducting an evidentiary

23  hearing, on July 11, 2007.  (Resp't's Loc. Doc. 14.)

24      On August 21, 2007, this court issued an order lifting the stay.  (Doc. No. 26.)

25  On September 23, 2007, counsel for petitioner filed the second amended petition which

26  contained all of petitioner's claims, including the recently exhausted ineffective assistance of

counsel and insufficiency of the evidence claims referred to above.  (Doc. No. 29.)  On February 20, 2008, counsel for respondent filed an answer addressing all of petitioner's claims on the merits.  (Doc. No. 38.)  On May 2, 2008, counsel for petitioner filed a traverse.  (Doc. No. 46.)

ANALYSIS

I.  <u>Standards of Review Applicable to Habeas Corpus Claims</u>

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  <u>See</u> <u>Peltier v. Wright</u>, 15 F.3d 860, 861 (9th Cir. 1993); <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing <u>Engle v. Isaac</u>, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991); <u>Park v. California</u>, 202 F.3d 1146, 1149 (9th Cir. 2000); <u>Middleton</u>, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues <u>de novo</u>.  <u>Milton v. Wainwright</u>, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  <u>See</u> <u>Lindh v. Murphy</u>, 521 U.S. 320, 336 (1997); <u>Clark v. Murphy</u>, 331 F.3d 1062, 1067 (9th Cir. 2003).  Title 28 U.S.C. § 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

<u>See also</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 792-93 (2001); <u>Williams v. Taylor</u>, 529 U.S. 362 (2000); <u>Lockhart v. Terhune</u>, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision

1   does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review

2   of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  See

3   also Frantz v. Hazey, 513 F.3d 1002, 1013 (9th Cir. 2008) (en banc) ("[I]t is now clear both that

4   we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such

5   error, we must decide the habeas petition by considering de novo the constitutional issues

6   raised.").

7            The court looks to the last reasoned state court decision as the basis for the state

8   court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  If the last reasoned

9   state court decision adopts or substantially incorporates the reasoning from a previous state court

10  decision, this court may consider both decisions to ascertain the reasoning of the last decision.

11  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Where the state court

12  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

13  habeas court independently reviews the record to determine whether habeas corpus relief is

14  available under § 2254(d).  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Pirtle v.

15  Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).  When it is clear that a state court has not reached

16  the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's

17  deferential standard does not apply and a federal habeas court must review the claim de novo.

18  Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

19  II.  Petitioner's Claims

20       A.  Ineffective Assistance of Counsel

21            Petitioner claims that his trial counsel rendered ineffective assistance of counsel

22  by: (1) failing to adequately investigate self-defense and alibi defenses; (2) failing to utilize an

23  independent forensic pathologist as an expert witness at trial; (3) failing to conduct an adequate

24  investigation into the victim's background; (4) failing to object to the prosecution's introduction

25  of inadmissible character evidence; and (5) failing to assert a "peremptory challenge" against the

26  /////

1    judge assigned to preside at trial.  After setting forth the applicable legal principles, the court will

2    evaluate these claims in turn below.

3          1. Legal Standards

4                The Sixth Amendment guarantees the effective assistance of counsel.  The United

5    States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

6    Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of

7    counsel, a petitioner must first show that, considering all the circumstances, counsel's

8    performance fell below an objective standard of reasonableness.  466 U.S. at 687-88.  After a

9    petitioner identifies the acts or omissions that are alleged not to have been the result of

10   reasonable professional judgment, the court must determine whether, in light of all the

11   circumstances, the identified acts or omissions were outside the wide range of professionally

12   competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a

13   petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland,

14   466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for

15   counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

16   694.  A reasonable probability is "a probability sufficient to undermine confidence in the

17   outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981

18   (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was

19   deficient before examining the prejudice suffered by the defendant as a result of the alleged

20   deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of

21   sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955

22   (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

23                Defense counsel has a "duty to make reasonable investigations or to make a

24   reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at

25   691.  "This includes a duty to . . . investigate and introduce into evidence records that

26   demonstrate factual innocence, or that raise sufficient doubt on that question to undermine

8

1   confidence in the verdict." Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (citing Hart v.

2   Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999)).   In this regard, it has been recognized that "the

3   adversarial process will not function normally unless the defense team has done a proper

4   investigation." Siripongs v. Calderon (Siripongs II), 133 F.3d 732, 734 (9th Cir. 1998) (citing

5   Kimmelman v. Morrison, 477 U.S. 365, 384 (1986)).  Therefore, counsel must, "at a minimum,

6   conduct a reasonable investigation enabling him to make informed decisions about how best to

7   represent his client." Hendricks v. Calderon, 70 F.3d 1032, 1035 (9th Cir. 1995) (quoting

8   Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994) (internal citation and quotations omitted).

9   On the other hand, where an attorney has consciously decided not to conduct further investigation

10  because of reasonable tactical evaluations, his or her performance is not constitutionally

11  deficient.  See Siripongs II, 133 F.3d at 734; Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.

12  1998); Hensley v. Crist, 67 F.3d 181, 185 (9th Cir. 1995).  "A decision not to investigate thus

13  'must be directly assessed for reasonableness in all the circumstances.'" Wiggins, 539 U.S. at

14  533 (quoting Strickland, 466 U.S. at 691).  See also Kimmelman, 477 U.S. at 385 (counsel

15  "neither investigated, nor made a reasonable decision not to investigate"); Babbitt, 151 F.3d at

16  1173-74.  A reviewing court must "examine the reasonableness of counsel's conduct 'as of the

17  time of counsel's conduct.'" United States v. Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990)

18  (quoting Strickland, 466 U.S. at 690).  Furthermore, "'ineffective assistance claims based on a

19  duty to investigate must be considered in light of the strength of the government's case.'" Bragg,

20  242 F.3d at 1088 (quoting Eggleston v. United States, 798 F.2d 374, 376 (9th Cir. 1986)).

21          In assessing an ineffective assistance of counsel claim "[t]here is a strong

22  presumption that counsel's performance falls within the 'wide range of professional assistance.'"

23  Kimmelman, 477 U.S. at 381 (quoting Strickland, 466 U.S. at 689).  There is in addition a strong

24  presumption that counsel "exercised acceptable professional judgment in all significant decisions

25  made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

26  /////

2. <u>Failure to Conduct Adequate Investigation into Possible Defenses</u>

Petitioner claims that his trial counsel rendered ineffective assistance by failing to adequately investigate the self-defense and alibi defenses. (Second Am. Pet. at 13.)  He acknowledges that his counsel presented an alibi defense at trial, but argues that the defense was improperly investigated.  Specifically, petitioner argues that his trial counsel failed to investigate a tire store and a sports bar that could have provided additional support for his alibi defense.  He also states that counsel "told the investigator to not produce a report of an interview of a witness who could provide an alibi for Petitioner's whereabouts on the day of the shooting." (<u>Id.</u> at 14.) Petitioner contends that his trial counsel "misstat[ed] the facts" when he testified at the hearing on the motion for new trial that he had instructed the investigator to investigate the tire store and sports bar.  (<u>Id.</u>)  Petitioner also states that he told his trial counsel he was with another person (Antoine Walker) on the night of the shooting.  (<u>Id.</u> at 15.)

In support of these arguments, petitioner presents the declaration of Rick von Geldern, the private investigator retained by trial counsel to work on petitioner's case. (Resp't's Lod. Doc. 13, Ex. 1.)  Mr. von Geldern states in his declaration, among other things, that he was "never directed to investigate at "Cheers" (the sports bar) or "Tires to Go" (the tire store) and in fact did not conduct investigation at those retail establishments.  Von Geldern also explains:

> Barbara Brown was interviewed on January 8, 2001 and she advised me that on the date of the shooting of David Bell she answered her front door and a friend of Tony Allen's was at the door.  Tony Allen walked from a bedroom to the door and left with the unidentified male.  Ms. Brown stated that Tony Allen had been at the house for "quite a while" prior to the knock on the door ant [sic] Tony Allen's departure from the house.  Ms. Brown stated that Mr. Allen had departed "a couple of hours" prior to the police arriving at the home.
>
> I advised [petitioner's trial counsel] of my interview with Ms. Brown and was advised not to prepare a report.

(<u>Id.</u>)

/////

1    Petitioner also claims that his trial counsel improperly failed to investigate and

2    present a defense based upon self-defense, even though "it was apparent from the facts that a

3    defense theory of self-defense was the only viable defense." (Second Am. Pet. at 15.)  Petitioner

4    explains that, although he and his trial counsel discussed whether to present a defense of self-

5    defense, his counsel decided not to present that theory of defense even though he had not

6    conducted adequate investigation into its viability.  (Id. at 14.)  Petitioner states that his trial

7    counsel did not meet with him enough and did not question him about his involvement in the

8    shooting, nor did he ask petitioner if he knew who had shot the victim.  (Id.)  Petitioner asserts

9    that a defense of self-defense "was so evident that the Court sua sponte issued self-defense jury

10   instructions." (Id. at 17.)  He argues that his trial counsel's summary rejection of a defense based

11   upon a self-defense theory "was not the product of careful and attentive consultation with the

12   client nor the product of a thorough investigation of the facts [but] was based upon an

13   uninformed evaluation of Petitioner's case."  (Id. at 16.)

14   Petitioner also contends that he suffered prejudice from trial counsel's failure to

15   present a defense of self-defense.  He notes that the jury convicted him of second degree murder

16   even though the prosecutor argued that petitioner shot the victim after lying in wait.  (Id.)

17   Petitioner argues that "a self-defense argument that he did do it, but that he had a justifiable

18   reason for doing it, was exactly what the jury was looking for." (Id. at 17.)

19   In affirming petitioner's conviction on appeal, the California Court of Appeal

20   rejected petitioner's arguments in this regard.  In doing so, the appellate court explained as

21   follows:

22        Defendant's appellate arguments are based largely on his
          declaration and testimony in support of the new trial motion, and
23        on a view of the record most favorable to his claim.  However,
          consistent with the standards of appellate review, we must view the
24        record in a light most favorable to the decision of the trial court.
          Thus, we will adopt the trial court's view of the facts to the extent
25        that view is supported by the evidence.

26   /////

In this light, many of defendant's assertions on appeal must be disregarded.  For example, defendant asserts that [attorney] Sherriff visited him only eight times before his first trial and did not meet with him at all between the first and second trials.[5]  However, Sherriff testified (1) it is his practice to meet with clients more than most attorneys, and (2) he met with defendant more than he meets with most clients.  When the prosecutor produced the jailhouse visitor logs to refresh Sherriff's recollection, it appeared that Sherriff had visited defendant 35 to 50 times, not counting investigator visits, and this was more consistent with his recollection.

For another example, defendant asserts that during his first meeting with Sherriff, he told him the facts of the shooting.  But Sherriff testified that defendant initially claimed he was in Colorado at the time of the shooting; that defendant later admitted he was in Sacramento but claimed he was not at the scene of the shooting; that defendant later admitted he was at Deborah's house earlier, but claimed to have left before the shooting; that relatively late in the proceedings, Sherriff was not clear on the exact time, defendant alluded to the fact he may have been at the scene but someone else was the shooter; and that defendant later suggested his friend, Antoine Walker, was the shooter.[6]  On motion for a new trial, defendant admitted he shot Bell and was there alone.  He said that, when he encountered Bell, they began arguing and then tussling; that Bell tried to pull a pistol out of his pocket and in a struggle for the gun it went off; and that defendant got the gun away from Bell and, out of reflex, shot twice.  Although defendant claimed he told this version to Sherriff, he later admitted he never told Sherriff that he shot Bell, and also admitted he told Sherriff that he did not want to present a self-defense argument and did not want to present any defense that would place him at the scene.

We also reject defendant's characterizations of the record.  For example, he asserts that evidence of his prior convictions came before the jury by virtue of his parole status and that, when his

---

[5]  The first effort to try this case ended in a mistrial when a detective from Denver inadvertently revealed that, during the search for defendant in Denver, officers were looking for a burgundy or maroon Expedition because they thought such a vehicle had been at the crime scene at the time of the shooting.  Defendant owned such a vehicle and was in Sacramento on the day of the shooting, but there was no witness who placed the vehicle at the scene of the shooting.  The trial judge viewed the Denver detective's statement as too prejudicial to be cured by admonition and granted a mistrial.

[6]  Sherriff testified that when defendant alluded to the possibility Walker was the shooter, Sherriff constantly tried to get more specific information from defendant, but defendant would not provide the clarity that Sherriff sought.  Sherriff also testified he told defendant that, if in fact Walker was the shooter, then having defendant testify to this fact would be the way to go.  However, defendant never said he would be willing to testify in this regard.

parole officer testified, she had such a voluminous file that it took the entire morning to review it.[7]  He asserts that the jury was left to speculate about the types of heinous crimes he had been convicted of in the past.  In fact, Sherriff obtained an agreement from the district attorney's office that the prosecutor would not attempt to produce evidence of defendant's prior record unless the defense first presented evidence of Bell's record.  (See Evid. Code, § 1103.)  More remarkable in light of defendant's criminal record, Sherriff got the prosecutor to stipulate to the jury that defendant had never been convicted of a crime involving violence.[8]

Defendant asserts it was so obvious self-defense was the only viable defense that the court gave a full range of self-defense instructions sua sponte.  In fact, during trial, Sherriff developed evidence to suggest the shooting may have involved self-defense, so-called imperfect self-defense, or a heat of passion, and he asked the court to instruct on those issues as well as all lesser included offenses.  The prosecutor agreed there was a sufficient evidentiary basis to support those instructions.  A trial court's duties to instruct sua sponte arise when neither party requests instructions on a particular issue.  Since the parties agreed the that instructions were appropriate, the court's duties to instruct sua sponte were not implicated here.

Defendant asserts the court found Sherriff's representation to have been inadequate, but concluded there was insufficient prejudice to warrant a new trial.  In fact, the court agreed with defendant on one point only.  It agreed that when Sherriff obtained Bell's rap sheet indicating a significant criminal history, he should have gone further and obtained investigation reports concerning Bell's crimes.  But the court found this failure to be nonprejudical.  In all other respects, the court rejected defendant's claims of ineffective assistance.

Defendant asserts "it was apparent from the facts that a defense theory of self-defense was the only viable defense," and also claims "[a]n alibi/some-other-person-did-it defense was completely unreasonable."  To the contrary, this was a particularly strong case for reliance on the presumption of innocence and a failure of satisfactory proof.

---

[7]  Defendant testified that when the parole officer was called as a witness, she brought with her a file about six inches thick.  When the file was produced, it was in fact less than an inch thick.

[8]  Defendant's parole status was such a significant part of his relationship with Deborah and her relationship with Bell that it would have been difficult to avoid placing it before the jury. On the other hand, it was beneficial to the defense in a number of ways. Thus, rather than attempt to cover it up, the defense elected to bring it out with a stipulation that defendant had not been convicted of a violent crime.

The prosecution could not produce any physical evidence, such as fingerprints, blood or tissue analysis, ballistics tests, or the possession of the murder weapon, to place defendant at the scene when the shooting occurred.  And the prosecution could not produce any eyewitnesses to place defendant or his vehicle at the scene at the time of the shooting.  One neighbor told police that after hearing shots, he opened his garage door and saw a small white car, probably a Toyota, speeding away.  But defendant's car was a maroon or burgundy Expedition, and there was no evidence to connect him with a small white car.

Although, during the investigation, Deborah told officers that defendant was at her house well into the evening, she testified at trial that he left as it was getting dark.  Deborah's teenage daughter also testified that defendant left when it was just getting dark.  This was many hours before the shooting.

Bell, on the 9-1-1 tape and to the first officer on the scene, said defendant shot him.  However, Deborah testified that Bell had never met or seen defendant in person, and the prosecution could not establish otherwise.[9]  Although Deborah told police officers that Bell had seen photographs of defendant at her house, she testified at trial that he had not.  Deborah testified that while Bell was in the hospital, she showed him a photograph of defendant and asked if he was the person who shot Bell, and that Bell shook his head apparently in the negative and turned to his side.

Immediately after the shooting, Bell gave a brief description of his assailant that did not totally match defendant.  While the description was not sufficiently different from defendant to establish that defendant was not the shooter, it was sufficiently different to leave room for doubt.

Sherriff established, through the testimony of neighbors, that gunshots are by no means uncommon in Deborah's neighborhood.  Some former neighbors testified they moved out of the neighborhood because of the frequency of shooting incidents.

Through the testimony of Deborah, her daughter, and Lateshia, Sherriff was able to portray defendant as a peaceful, hard-working, family man.  He would neither get jealous nor angry.  Deborah testified that she knew defendant had a relationship with Lateshia and did not care, and that defendant did not care if Deborah had relationships with other men.  As we have mentioned, although it was apparent from his parole status that defendant had a prior

---

[9]  Deborah testified that on the morning before the shooting, while she was riding with Bell in his car, she thought she saw defendant pass by through an intersection.  The prosecutor sought to establish that Bell had an opportunity to see defendant at this time, but was unable to establish more than mere possibility.

conviction, Sherriff obtained a stipulation that defendant had never been convicted of a crime involving violence.

And Sherriff was able to take advantage of defects in the police investigation.  It appeared that after the shooting, the police focused on defendant and did not consider other possible suspects.  Some things that could have been done were left undone.  For example, the police did not test the expended bullet shells for fingerprints.  Although police walked the course of the blood trail, they did not thoroughly search the area for a weapon.  They did not search Bell's car.  During the two weeks Bell was in the hospital after the shooting, the police did not interview him or show him a photographic lineup.

Deborah testified that on one of her visits to the hospital, Bell told her the police had been to talk with him and had showed him a photographic lineup.  She asked if he saw defendant in the lineup, and he shook his head.  Prior to trial, the defense sought discovery of any photographic lineup and was told there had not been one.  During trial, one of the detectives discovered a photographic lineup in his file and turned it over to the prosecutor, who in turn gave it to the defense.  The detective testified he prepared the lineup with the intent of showing it to Bell when he was sufficiently recovered, but when Bell died, the detective put it in the file and forgot about it.  Together, the belated production of the lineup, earlier representations that there was no lineup, and Deborah's testimony, allowed the defense to imply that (1) Bell had been shown a lineup, and (2) when Bell failed to identify defendant, police officers suppressed the fact because it did not correspond with their view of the case.

In summary, the evidence at trial presented the reasonably arguable possibility that (1) Bell arrived at Deborah's house after defendant had departed; (2) Bell got into an altercation with some other person, perhaps in an attempted robbery or simply because he was not from that neighborhood; and (3) Bell would have no basis for recognizing whether or not his assailant was defendant, but assumed it was because he viewed defendant as a rival for Deborah's attention.

On this record, we are satisfied that, while the prosecution evidence was legally sufficient, it was a close question whether it would be sufficient to persuade a jury beyond a reasonable doubt.[10]  Thus, the defense position that defendant was not there and

---

[10]  In ordering a mistrial during the first trial, the trial judge specifically noted the inherent weaknesses in the prosecution case.  It was because of these inherent weaknesses that the court ordered a mistrial for inadvertent error which would, in most cases, be regarded as readily curable.

someone else committed the crime was not an unreasonable approach to defending the case.

These examples are sufficient to demonstrate that the manner in which we must view the record does not correspond with defendant's view of the matter as reflected in his brief. We will consider defendant's specific assertions in the appropriate appellate manner.

Defendant's primary assertion is that counsel was ineffective in failing to pursue a theory of self-defense. In making this argument, defendant relies upon the decision in Phillips v. Woodford (9th Cir.2001) 267 F.3d 966, which involved a petition for writ of habeas corpus after the petitioner was convicted of capital murder and sentenced to death. At the petitioner's trial, there had been overwhelming credible evidence that he was the perpetrator; yet, despite significant evidence that the incident involved a mutual shootout rather than an attempted robbery as charged, the sole defense presented was the petitioner's wholly unsupported and implausible claim that he was out of town at the time of the crime. The court concluded the petitioner made a sufficient prima facie showing to warrant an evidentiary hearing on his claim that counsel was ineffective in failing to investigate, and perhaps confront him with, the difficulties in his implausible story. (Id. at p. 980; see also Johnson v. Baldwin (9th Cir .1997) 114 F.3d 835, 838-840.)

In making his appellate contention, defendant ignores two other Ninth Circuit decisions, Bean v. Calderon (9th Cir.1998) 163 F.3d 1073, at page 1082, and Turk v. White (9th Cir.1997) 116 F.3d 1264, at page 1266. Each of those decisions held that once counsel reasonably chooses the defense theory of the case, counsel is under no further duty to investigate and pursue an alternative and inconsistent defense theory. In Phillips v. Woodford, supra, 267 F.3d at page 979, the court noted and agreed with those decisions. However, the court found they were not controlling because, in the case before it, counsel had chosen to present the petitioner's unsupported and implausible claim that he was out of town in the face of overwhelming credible evidence he was the perpetrator and without investigating and confronting the petitioner with the defects in his implausible story. (Ibid.)[11]

---

[11] Obviously, counsel may not make up a defense and then tell the defendant what he must say to support it. While there may be a fine line between vigorous advocacy and subornation of perjury, it is a line that counsel may not cross. (In re Jones (1971) 5 Cal. 3d 390, 400; see also People v. Guzman (1988) 45 Cal. 3d 915, 943-944, disapproved on another ground in Price v. Superior Court (2001) 25 Cal. 4th 1046, 1069, fn. 13.) We will give the court the benefit of the doubt and not read its opinion in Phillips v. Woodford, supra, 267 F.3d 966, to suggest otherwise.

We already have rejected defendant's claim that self-defense was the only viable defense, and we have concluded that the primary defense theory, i.e., defendant was not there and did not commit the crime, was not unreasonable.  Under the circumstances, Sherriff's decision to take the position that defendant was not there, and to rely on the presumption of innocence and the inherent weaknesses in the evidence, was a reasonable tactical decision. Under the decisions in <u>Bean v. Calderon</u>, <u>supra</u>, 163 F.3d at page 1082, and <u>Turk v. White</u>, <u>supra</u>, 116 F.3d at page 1266, and with the concurrence of the decision in <u>Phillips v. Woodford</u>, <u>supra</u>, 267 F.3d at page 979, Sherriff was not required to pursue an alternative and inconsistent theory of self-defense.

In any event, Sherriff did present evidence and argument in support of a self-defense theory.  Throughout the trial, Sherriff attempted to portray defendant as a calm, peaceful, family man who was not subject to jealousy and did not care whether Deborah would have a relationship with Bell.  On the other hand, he portrayed Bell as a mean, short-tempered, abusive person who was subject to jealousy and anger.  He demonstrated that Bell abused alcohol and cocaine and in fact had those substances in his system at the time of the shooting.  He presented evidence that a person who abuses cocaine and alcohol can exhibit the symptoms of a paranoid schizophrenic. He presented evidence that it was Bell who sought a confrontation with defendant rather than vice-versa.  He requested instructions and made self-defense arguments while still adhering to the primary defense theory that defendant was not at the scene of the crime.

The gist of defendant's appellate argument is that Sherriff should have abandoned the primary defense theory and done more to pursue a self-defense theory.  Under the circumstances, there were only two things Sherriff could have done to pursue a self-defense theory more than he did.

Sherriff could have convinced defendant to testify to claim self-defense.  However, there were several difficulties with this approach.  First, it would have meant giving up the primary defense position that, we have concluded, had a reasonable chance of success.  Second, defendant never admitted to Sherriff that he was the person who shot Bell and did not present a self-defense version of the event.  Third, defendant continued to maintain he did not want to present a defense that would put him at the scene. Fourth, defendant's testimony would have opened the door to impeachment with evidence of his prior felony convictions.  Fifth, from the record it appears defendant would not have been a good witness.  His testimony on the new trial motion was often nonresponsive, evasive, and internally inconsistent, and he was caught in at least a couple of prevarications.  Moreover, it is apparent from the record that defendant had a particular dislike for the prosecutor and that extensive cross-examination by the

prosecutor could well have provoked a response which would taint defendant in the eyes of the jury.

Alternatively, Sherriff could have presented more evidence of Bell's character.  (Evid. Code, § 1103, subd. (a).)[12]  Bell had a significant criminal history, including arrests for crimes such as robbery, spousal abuse, and drug offenses, and he used or possessed firearms in some of his crimes.  However, if Sherriff had attacked Bell's character pursuant to Evidence Code section 1103, subdivision (a), this would have triggered subdivision (b) of that section, which would have permitted the prosecutor to present evidence of defendant's character for violence or trait of character for violence, in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct.

Defendant's criminal history is one that a defense attorney reasonably could not want to be placed before a jury.  Defendant's record includes a juvenile adjudication for first degree murder with the personal use of a firearm.  (The prosecutor was unaware of the prior murder adjudication until after the trial ended; but Sherriff was aware of it and did not want to risk its discovery and production at trial.)  Also, in addition to property and drug offenses, and at least four separate convictions for unlawful possession of firearms, defendant's criminal history includes arrests for the violent crimes of assault with a deadly weapon and battery with serious injury.[13]  Indeed, Sherriff testified he believed

/////

---

[12]  Self-defense takes into consideration all of the surrounding circumstances, including what defendant knew about the victim's character at the time he acted.  (People v. Humphrey (1996) 13 Cal. 4th 1073, 1082-1083.)  Defendant testified that all he knew about Bell was he was "some guy that did end up messing with my wife."  Accordingly, Bell's prior history was not relevant with respect to defendant's subjective belief in the need for self-defense or the objective reasonableness of that belief.  However, Bell's past acts would have been admissible to establish Bell's character for aggression or violence in order to prove that he did, or may have, acted consistent with that character at the time of the shooting.  (Evid. Code, § 1103, subd. (a).)

[13]  At oral argument in this court, defendant's appellate counsel disputed whether the record shows that defendant has a juvenile adjudication for committing first degree murder and a history of other violent behavior.  We direct counsel's attention to page 646 of the clerk's transcript, a letter from the California Department of the Youth Authority (CYA) written by Dominic Hatfield, Supervisor, Master Files, stating: "[CYA's] records indicate that [defendant] was committed to the Youth Authority by the Juvenile Court of Los Angeles County on October 12, 1978, for 187 PC Murder (1st Degree) with 12022.5 PC, 242 PC Battery (M) and was discharged from the Youth Authority on April 27, 1984 . . . ."  We also direct counsel's attention to pages 618, 619, and 620 of the clerk's transcript, portions of the probation report that state defendant was arrested for assault with a deadly weapon, stabbing the victim with a knife, in 1987, and for battery with serious injury in 1991.

18

1    that, if he got into a volley with the prosecutor over respective
      records, defendant was going to suffer.[14]
2
      When we consider the trial record together with the evidence
3     presented on motion for a new trial, we are satisfied the trial court
      was correct in rejecting defendant's claim of ineffective assistance
4     of counsel based upon Sherriff's failure to pursue, and rely
      exclusively upon, a self-defense theory.  The primary theory
5     Sherriff presented was reasonable and had a reasonable chance of
      success.  Reliance on that theory, with self-defense, imperfect
6     self-defense, and heat-of-passion as secondary defenses, avoided
      pitfalls that would have attended sole reliance upon self-defense.
7     As a tactical choice, it was within the range of reasonable
      competence.
8

9    (Opinion at 8-21.)

10          At the hearing on the motion for new trial, petitioner's trial counsel testified that

11   von Geldern was assigned the task of investigating petitioner's alibi, including petitioner's

12   assertion that he had been at a sports bar on the night of the shooting.  (RT at 293-94.)  Counsel

13   stated that neither the sports bar nor the tire store could be located and that many aspects of

14   petitioner's alibi could not be confirmed.  (Id. at 2595, 2598, 2600-01, 2602.)  On the other hand,

15   von Geldern declares that he was not directed to investigate either the sports bar or the tire store.

16   Petitioner argues that this discrepancy proves his point that his trial counsel failed to conduct

17   sufficient investigation.  However, assuming arguendo that trial counsel's performance was

18   deficient in failing to direct von Geldern to interview employees of the sports bar or the tire store,

19   petitioner has failed to demonstrate that counsel's actions resulted in prejudice.  Petitioner has

20   not provided any evidence that such investigation would have provided support for an alibi

21

22         [14]  Sherriff reached a stipulation with the prosecutor that the prosecutor would not seek to
     present evidence of defendant's prior criminal history unless the defendant first presented
23   evidence of Bell's history.  Actually, the extent to which Sherriff did attempt to establish Bell's
     violent character would have been sufficient to support a prosecution effort to establish
24   defendant's violent character.  (People v. Walton (1996) 42 Cal. App. 4th 1004, 1014-1015,
     disapproved on another ground in People v. Cromer (2001) 24 Cal. 4th 889, 901, fn. 3.)
25   Nevertheless, the prosecutor adhered to the stipulation and did not attempt to present evidence of
     defendant's criminal history.  Moreover, he stipulated for the jury that defendant had never been
26   convicted of a violent offense.

                                              19

1  defense.  Indeed, petitioner admitted at the hearing on the motion for a new trial that he was the

2  person who shot Bell.  Accordingly, investigation into petitioner's purported alibi would not have

3  been fruitful. See Villafuerte v. Stewart, 111 F.3d 616, 632 (9th Cir. 1997) (petitioner's

4  ineffective assistance claim rejected where he presented no evidence concerning what counsel

5  would have found had he investigated further, or what lengthier preparation would have

6  accomplished); Ceja v. Stewart, 97 F.3d 1246, 1255 (9th Cir. 1996) (no ineffective assistance of

7  counsel where petitioner failed to explain "what compelling evidence additional interviews

8  would have unearthed or to explain how an investigation of aggravation evidence would have

9  negated the evidence of the multiple gunshot wounds");  United States v. Berry, 814 F.2d 1406,

10  1409 (9th Cir. 1987) (appellant failed to meet prejudice prong of ineffective assistance claim

11  because he offered no indication of what potential witnesses would have testified to or how their

12  testimony might have changed the outcome of the hearing).

13          With respect to the post-trial information provided by the defense investigator

14  with respect to his interview of Barbara Brown, petitioner has not demonstrated that he was at

15  Brown's house at the time of the shooting or that she would have so testified.  Bragg, 242 F.3d at

16  1088 (no ineffective assistance where petitioner did "nothing more than speculate that, if

17  interviewed," a witness might have given helpful information); Dows v. Wood, 211 F.3d 480,

18  486 (9th Cir. 2000) (no ineffective assistance of counsel where there was no evidence in the

19  record that an alibi witness actually existed and petitioner failed to present an affidavit

20  establishing that the alleged witness would have provided helpful testimony for the defense);

21  United States v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988) (no ineffective assistance

22  because of counsel's failure to call a witness where, among other things, there was no evidence in

23  the record that the witness would testify).  Further, petitioner's trial counsel testified at the

24  hearing on the motion for a new trial that it was not his practice to have investigator von Geldern

25  "make written statements about witnesses we weren't going to anticipate using."  (RT at 2598.)

26  That may well have been the case with Ms. Brown.  The Strickland standard "places the burden

1   on the defendant, not the State, to show a 'reasonable probability' that the result would have been

2   different." Wong v. Belmontes, ___ U.S. ___, 130 S. Ct. 383, 390-391 (2009) (quoting

3   Strickland, 466 U.S. at 694).  Petitioner has failed to meet that burden with respect to this

4   ineffective assistance of counsel claim.

5          The thorough decision of the California Court of Appeal for the Third Appellate

6   District rejecting petitioner's claim that his trial counsel rendered ineffective assistance by failing

7   to thoroughly investigate available defenses is not contrary to or an unreasonable application of

8   federal law, nor is it based upon an unreasonable determination of the facts.  As explained by the

9   state appellate court, it was reasonable for petitioner's trial counsel to present an alibi defense in

10  light of the weaknesses in the prosecution's case.  Further, although counsel suggested the

11  possibility of presenting a defense based on a self-defense theory, petitioner refused to testify in

12  support of such a defense.  (RT at 2612-16.)  Even then, despite petitioner's lack of cooperation,

13  jury instructions on self-defense were given at the request of petitioner's trial counsel.  Under the

14  circumstances of this case, and for the reasons expressed by the state appellate court, petitioner's

15  trial counsel did not render ineffective assistance in failing to investigate and present an adequate

16  defense.  Accordingly, petitioner is not entitled to habeas relief with respect to this claim.

17          3.  Failure to Utilize an Independent Forensic Pathologist as an Expert Witness

18          Petitioner's next claim is that his trial counsel rendered ineffective assistance by

19  failing to retain an independent forensic pathologist to testify as to the cause of Mr. Bell's death.

20          Forensic pathologist Gregory Reiber testified at petitioner's trial about the results

21  of the autopsy performed on the victim as reflected in the coroner's report.  (RT at 1476-1551.)

22  The coroner's report was prepared by a colleague of Dr. Reiber's.  (Id. at 1478.)  Dr. Reiber was

23  a member of a medical group that provided coroner's services to the Sacramento County

24  Coroner's Office.  (Id. at 1476, 1479.)  Petitioner states that Reiber was also an Assistant

25  Professor of pathology for UC Davis Medical Center, where the victim died.  (Second Am. Pet.

26  at 18.)  Dr. Reiber testified that the autopsy report reflected the cause of the victim's death was

"critically low blood pressure from blood loss due to a carotid artery blowout due to a penetrating gunshot wound to the head." (RT at 1503.) Dr. Reiber agreed with the coroner's assessment that "the gunshot wound was responsible for the artery blowout that resulted in Mr. Bell's death." (Id. at 1505.) Reiber reached this conclusion despite the fact that Bell had significant amounts of cocaine and alcohol in his system at the time he was admitted to the hospital, and that Bell exhibited such combative behavior at the hospital that he had to be restrained. (Id. at 1505-06, 1512-3.) Petitioner argues that, because of Dr. Reiber's association with the hospital where the victim died and the coroner's office which provided his autopsy report, "he could not be relied upon to give an unbiased expert testimony with regard to the cause of death of David Bell." (Id.) Petitioner also suggests that Bell's combative behavior at the hospital may have influenced Dr. Reiber's testimony. (Second Am. Pet. at 18-19.) Petitioner also contends that, because physicians at UC Davis Hospital were unable to save Bell's life, Dr. Reiber may have been motivated to "protect the interests" of the hospital during his testimony. (Id. at 19.)

Petitioner alleges that the coroner who performed Bell's autopsy and wrote the autopsy report was charged with possession of controlled substances several months after Bell's death and was placed on administrative leave. (Id.; see also RT at 2645.) According to petitioner, it was discovered that the coroner "had been abusing prescription drugs for years." (Second Am. Pet. at 19.) Petitioner states that Bell's initial autopsy report was later amended to include "cocaine and alcohol ingestion" as additional causes of his death, and argues that the evidence introduced at his trial "gave every indication" that the autopsy of Bell was "done in an incomplete, non-thorough, uncoordinated and slip-shod manner." (Id. at 19, 20.) Petitioner speculates as to whether the coroner was under the influence of drugs at the time he conducted the autopsy and produced the autopsy report and whether the coroner's ultimate findings regarding the cause of Bell's death were accurate. (Id. at 19-20.) Petitioner argues that all of the above factors and questions provided "numerous reasons not to provide a thorough and impartial opinion as to the autopsy and autopsy reports of David Bell." (Id. at 20.) Petitioner also suggests

1  that, contrary to Dr. Reiber's testimony, Bell's combative actions in the hospital and the cocaine

2  and alcohol in his system at the time of the shooting may have been "supervening causes" of his

3  death and that testimony to this effect may have led to a more favorable verdict at petitioner's

4  trial.  (Id.)  In short, petitioner argues that his trial counsel rendered ineffective assistance

5  because he did not provide the jury with testimony from an impartial, independent pathologist

6  who was qualified to give a medical opinion with respect to the cause of Bell's death.  (Id. at

7  21.)[15]

8          Petitioner raised this claim for the first time in the petition for a writ of habeas

9  corpus filed on his behalf in the California Supreme Court.  (Resp't's Lod. Doc. 13.)  That

10  petition was denied with citations to In re Robbins, 18 Cal. 4th 770, 780 (1998) and In re Clark, 5

11  Cal. 4th 750 (1993).  (Resp't's Lod. Doc. 14.)  Respondent argues that petitioner's claim in this

12  regard should be denied on the merits.

13          Assuming arguendo that petitioner's trial counsel was deficient in failing to call

14  an independent expert to testify to the cause of Bell's death, petitioner has failed to demonstrate

15  any prejudice flowing from such an error, or that the results of the proceeding would have been

16  different if an independent pathologist had been retained by petitioner's counsel.  Petitioner's

17  conclusory allegations that Dr. Reiber did not give objective testimony because of his association

18  with both U.C. Davis and the coroner's office are clearly insufficient to establish prejudice.  See

19  Jones v. Gomez, 66 F.3d 199, 204 (9th Cir. 1995) ("'[c]onclusory allegations which are not

20  supported by a statement of specific facts do not warrant habeas relief'") (quoting James v. Borg,

21  24 F.3d 20, 26 (9th Cir. 1994)).

22  /////

23

24          [15]  Petitioner asserts that he was entitled to the services of an expert witness under
    California law free of charge.  (Traverse at 5-6.)  At the hearing on the motion for new trial,
25  petitioner's trial counsel testified that petitioner was unable to pay for an expert witness but that
    this had "no effect" on trial counsel's decision not to hire an independent pathologist.  (RT at
26  2646-47.)

1   Petitioner merely suggests that an independent pathologist might have:

2   1) help[ed] the trial attorney cross examine the opinions of Dr.
    Reiber; 2) testif[ied] as to his opinion of the cause of the victim's
3   death; 3) proffer[ed] an opinion concerning the adequacy of the
    treatment and care given to the victim by U.C. Davis; 4) provide[d]
4   an opinion as to whether the autopsy that was conducted was
    adequate and 5) opine[d] as to why the autopsy report was
5   changed.

6   (Second Am. Pet. at 9.)  However, there is no evidence indicating that the testimony of an

7   independent pathologist would have been any different than the trial testimony provided by Dr.

8   Reiber.  See Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997) (speculating as to what a

9   proposed witness would say is not enough to establish prejudice).  Specifically, there is no

10  evidence before this court that another pathologist would have reached a different conclusion as

11  to the cause of Mr. Bell's death or that petitioner would have been found guilty of a lesser crime

12  had a pathologist testified that Bell's ingestion of cocaine and alcohol as well as his combative

13  behavior were contributing factors in his death.  The court also notes that at the hearing on the

14  motion for a new trial, petitioner's trial counsel testified that he believed Dr. Reiber's testimony

15  was "powerfully effective and useful for the defense." (RT at 2647.)

16      The decision of the California Supreme Court rejecting this claim of ineffective

17  assistance of counsel is not contrary or an unreasonable application of Strickland.  Accordingly,

18  petitioner is not entitled to habeas relief with respect to this claim.

19      4.  Failure to Conduct Adequate Investigation into the Victim's Background

20      Petitioner claims that his trial counsel rendered ineffective assistance by failing to

21  adequately investigate the victim's background.  (Second Am. Pet. at 22-24.)  In this regard, he

22  argues that if counsel had conducted such an investigation he would have discovered Mr. Bell's

23  criminal history and Bell's record of "mental problems, emotional instability, history of drug and

24  alcohol abuse, and drug and alcohol abuse on the day of the shooting."  (Id. at 23.)

25      At the hearing on the motion for a new trial, petitioner's trial counsel testified

26  that, although he was aware Bell had a significant criminal background, he decided not to pursue

24

1  this avenue of investigation because he was aware that if he presented evidence of Bell's criminal

2  history it would allow the prosecutor to introduce evidence of petitioner's own significant

3  criminal background, including a juvenile homicide adjudication that was then unknown to the

4  prosecutor.  (RT at 2636-37, 2641-44, 2711-14.)  Petitioner's trial counsel wished to avoid the

5  introduction of evidence relating to petitioner's past violent conduct and, to that end, entered into

6  a stipulation pursuant to which the prosecutor agreed not to present evidence of defendant's prior

7  criminal history unless the defendant first presented evidence of Bell's history.  (Id. at 2643-44,

8  2713).  The prosecutor also stipulated to inform the jury that defendant had never been convicted

9  of a violent offense.

10          In ruling on petitioner's motion for new trial, the trial court concluded that

11  petitioner's counsel should have obtained written documentation regarding Bell's prior criminal

12  history, but also found that petitioner had not suffered prejudice as a result of his counsel's

13  failure to do so because "it could . . . arguably have backfired and resulted in conviction for first

14  degree murder."  (Id. at 2858-59.)  Similarly, the California Court of Appeal concluded that

15  petitioner's trial counsel acted reasonably in deciding not to investigate Bell's character and

16  criminal history because the introduction of this evidence would have allowed the prosecutor to

17  introduce damaging evidence of petitioner's own significant criminal history.  The state appellate

18  court explained:

19          Alternatively, [petitioner's trial counsel] could have presented
            more evidence of Bell's character. (Evid.Code, § 1103, subd.
20          (a).)[16]  Bell had a significant criminal history, including arrests for
            crimes such as robbery, spousal abuse, and drug offenses, and he
21          used or possessed firearms in some of his crimes.  However, if

22  _____

23          [16]  Self-defense takes into consideration all of the surrounding circumstances, including
     what defendant knew about the victim's character at the time he acted.  (People v. Humphrey
24   (1996) 13 Cal. 4th 1073, 1082-1083.)  Defendant testified that all he knew about Bell was he was
     "some guy that did end up messing with my wife."  Accordingly, Bell's prior history was not
25   relevant with respect to defendant's subjective belief in the need for self-defense or the objective
     reasonableness of that belief.  However, Bell's past acts would have been admissible to establish
     Bell's character for aggression or violence in order to prove that he did, or may have, acted
26   consistent with that character at the time of the shooting. (Evid. Code, § 1103, subd. (a).)

Sheriff had attacked Bell's character pursuant to Evidence Code section 1103, subdivision (a), this would have triggered subdivision (b) of that section, which would have permitted the prosecutor to present evidence of defendant's character for violence or trait of character for violence, in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct.

Defendant's criminal history is one that a defense attorney reasonably could not want to be placed before a jury.  Defendant's record includes a juvenile adjudication for first degree murder with the personal use of a firearm.  (The prosecutor was unaware of the prior murder adjudication until after the trial ended; but Sheriff was aware of it and did not want to risk its discovery and production at trial.)  Also, in addition to property and drug offenses, and at least four separate convictions for unlawful possession of firearms, defendant's criminal history includes arrests for the violent crimes of assault with a deadly weapon and battery with serious injury. [fn. omitted]  Indeed, Sheriff testified he believed that, if he got into a volley with the prosecutor over respective records, defendant was going to suffer.

(Opinion at 19-20.)[17]

Under the circumstances presented here, the decision of petitioner's trial counsel not to investigate and introduce evidence of Bell's criminal history was not outside the wide range of reasonable professional assistance.  See Wong, 130 S. Ct. at 387-88 (concluding that it was not ineffective to fail to present mitigating evidence where it would have opened the door to evidence damaging to petitioner).  Here, petitioner has failed to establish either deficient performance on the part of his trial attorney or prejudice.  Accordingly, he is not entitled to habeas relief on this claim.

5. Failure to Object to Inadmissible Character Evidence

Petitioner claims that his trial counsel rendered ineffective assistance by failing to object to the introduction at trial of evidence that petitioner was simultaneously married to two

---

[17]  Petitioner points out that at the hearing on the motion for new trial, petitioner's trial counsel stated that his failure to obtain all of the documents regarding Bell's criminal history was "an ineffective act." (Id. at 2803.)  However, counsel's statement in this regard does not constitute evidence that petitioner was denied his Sixth Amendment right to counsel by virtue of counsel's decision not to pursue the admission into evidence of Bell's criminal history.

women.  He argues, "this information was inadmissible character evidence which was offered for

no other purpose than to prejudice the jury." (Second Am. Pet. at 24.)  Petitioner also argues that

the prejudice caused by the introduction of this objectionable evidence was underscored by the

prosecutor's repeated references to the subject during his closing argument to the jury.  (Id. at 24-

25.)  The California Court of Appeal rejected this argument on appeal, reasoning as follows:

> Defendant also asserts that Sherriff provided ineffective assistance
> in failing to object to evidence of his marriage to Lateshia while
> still married to Deborah.  We disagree.  Defendant's relationship to
> the two women was such an integral part of the case, it would not
> have been possible to keep that out of evidence.  In addition, the
> marital relationships were relevant impeachment with respect to
> the testimony favorable to defendant given by each of the women.
> And, even if the fact of defendant's marriage to Lateshia had been
> excluded, the marital nature of his relationship with her would still
> have been admitted.  Moreover, the evidence had benefits for the
> defense.  It tended to establish that defendant would not have been
> so jealous of Bell's relationship with Deborah that he would
> murder Bell.  It enabled the defense to portray defendant as a good
> husband and stepfather to his new family.  It explained why
> defendant would go to live in Denver, although the terms of parole
> forbade him to leave the state without permission.  And his parole
> status provided an explanation why he would obtain a driver's
> license, adopt a false identity, and avoid the Denver police other
> than consciousness of guilt in the shooting of Bell.  The failure to
> object to evidence of defendant's marriage to Lateshia was neither
> incompetent nor prejudicial.

(Opinion at 21-22.)

        For the reasons expressed by the state appellate court, petitioner has failed to

establish that his trial counsel's decision not to object to evidence that petitioner simultaneously

had a marital relationship with two women fell below an objective standard of reasonableness.

Pursuant to California law, such evidence was clearly admissible to impeach the credibility of

Lateshia and Deborah.  See Cal. Evid. Code § 1101(a) (evidence regarding a person's character is

admissible to support or attack the credibility of a witness).  Further, as explained by the

California Court of Appeal, the defense was able to use the evidence that petitioner had a

relationship with Lateshia in Denver to bolster several aspects of the defense theory of the case.

The decision of the state courts rejecting petitioner's arguments in this regard is not contrary to or

27

1  an unreasonable application of <u>Strickland</u>.  Accordingly, petitioner is not entitled to habeas relief

2  with respect to this claim.

3        6.  <u>Failure to Challenge the Trial Judge</u>

4          Petitioner claims his trial counsel rendered ineffective assistance by refusing to

5  comply with petitioner's request to seek the assignment of a different trial judge pursuant to

6  California Code of Civil Procedure § 170.6 on the ground that the assigned trial judge was biased

7  or prejudiced against petitioner.  Petitioner argues that he suffered prejudice from counsel's

8  inaction because the trial judge ultimately made several unfavorable rulings "without substantial

9  justification" which "inured to Petitioner's detriment." (Second Am. Pet. at 25.)  Specifically,

10  petitioner notes that the trial judge denied his motion for a new trial even though the trial judge

11  stated that he believed that petitioner's trial counsel should have more fully investigated Mr.

12  Bell's criminal background and character.  (<u>Id.</u> at 26.)

13          Petitioner raised this claim for the first time in his petition for a writ of habeas

14  corpus filed in the California Supreme Court.  (Resp't's Lod. Doc. 13.)  The California Supreme

15  Court denied that petition with citations to <u>In re Robbins</u>, 18 Cal. 4th 770, 780 (1998) and <u>In re</u>

16  <u>Clark</u>, 5 Cal. 4th 750 (1993).  (Resp't's Lod. Doc. 14.)  Respondent argues that the claim should

17  be denied on the merits.

18          Petitioner has failed to demonstrate either deficient performance on the part of his

19  trial counsel or prejudice with respect to this claim.  As explained below, there is no evidence

20  before this court indicating that the trial judge was biased against petitioner.  The trial judge's

21  rulings, including his ruling denying petitioner's motion for a new trial, are fully supported by the

22  record and do not imply any bias against petitioner.  The California Supreme Court's rejection of

23  petitioner's claim in this regard is not contrary to or an unreasonable application of federal law.

24  Accordingly, petitioner is not entitled to relief with respect to this claim.

25  /////

26  /////

28

1             B.  Sufficiency of the Evidence

2           Petitioner's next claim is that there was insufficient evidence introduced at his

3  trial that "the gun shot wound allegedly inflicted by Petitioner was the actual cause of death of

4  David Bell." (Second Am. Pet. at 27.)  In this regard, petitioner argues that evidence introduced

5  at trial indicated that Bell's death may have been caused by "other supervening factors,"

6  including: (1) Bell's ingestion of alcohol and cocaine prior to the shooting; (2) the effect that

7  Bell's combative behavior in the hospital may have had on his injuries; and (3) "the medical

8  decision made by UC Davis Medical Center to not keep Bell under constant sedation."  (Id.)

9  Petitioner states that Bell's initial death certificate listed the cause of death as "an artery blowout

10  due to a gunshot wound to the head," but that the certificate was later amended to list "ethanol

11  and cocaine ingestion" as "secondary causes of death."  (Id.)  Petitioner also repeats his

12  allegation that Bell was extremely combative in the hospital, causing staff to strap him to his bed

13  for long periods of time and to recommend that he be provided with a sitter.  (Id. at 27-28.)

14  Petitioner notes that Bell also testified positive for cocaine and alcohol in his blood when he was

15  admitted to the hospital.  (Id. at 28.)  Petitioner argues that: (1) Mr. Bell may not have died of his

16  gunshot wound if he had been sedated instead of restrained; (2) Bell's ingestion of cocaine and

17  alcohol might have complicated the surgical repair and healing of his carotid artery; and (3)

18  medical malpractice may have been a "substantial factor" in Bell's death.  (Id. at 28-30.)  In his

19  traverse, petitioner argues:

20                    This is a situation in which the victim was no longer in harm due to
                  the alleged shooting.  The victim was making a recovery and even

21                    had the wherewithal to make unassisted phone calls to his friends.
                  The victim affirmatively placed his own health in danger by his

22                    self destructive behaviors.

23  (Traverse at 12.)

24           This claim was raised for the first time in petitioner's December 23, 2006, petition

25  for a writ of habeas corpus filed in the California Supreme Court.  (Resp't's Lod. Doc. 13.)  The

26  Supreme Court denied that petition, citing the decisions In re Robbins, 18 Cal. 4th 770, 780

1  (1998) and In re Clark, 5 Cal. 4th 750 (1993).  (Resp't's Lod. Doc. 14.)  Respondent urges the

2  court to deny the claim on the merits.

3          The Due Process Clause of the Fourteenth Amendment "protects the accused

4  against conviction except upon proof beyond a reasonable doubt of every fact necessary to

5  constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  There

6  is sufficient evidence to support a conviction if, "after viewing the evidence in the light most

7  favorable to the prosecution, any rational trier of fact could have found the essential elements of

8  the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he

9  dispositive question under Jackson is 'whether the record evidence could reasonably support a

10  finding of guilt beyond a reasonable doubt.'"  Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir.

11  2004) (quoting Jackson, 443 U.S. at 318).  "A petitioner for a federal writ of habeas corpus faces

12  a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction

13  on federal due process grounds."  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In

14  order to grant the writ, the federal habeas court must find that the decision of the state court

15  reflected an objectively unreasonable application of Jackson and Winship to the facts of the case.

16  Id. at 1275 & n.13.

17          The court must review the entire record when the sufficiency of the evidence is

18  challenged in habeas proceedings.  Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

19  vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is

20  the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

21  reasonable inferences from basic facts to ultimate facts."  Jackson, 443 U.S. at 319.  If the trier of

22  fact could draw conflicting inferences from the evidence, the court in its review will assign the

23  inference that favors conviction.  McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994).  The

24  relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether

25  the jury could reasonably arrive at its verdict.  United States v. Mares, 940 F.2d 455, 458 (9th

26  Cir. 1991).  Thus, "[t]he question is not whether we are personally convinced beyond a

30

1  reasonable doubt" but rather "whether rational jurors could reach the conclusion that these jurors

2  reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court

3  determines sufficiency of the evidence in reference to the substantive elements of the criminal

4  offense as defined by state law.  Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

5           Pursuant to California law,

6           to constitute murder, there must be, in addition to the death of a
           human being, an unlawful act which was the proximate cause of
7           that death.  The proximate cause of a death is a cause which in
           natural and continuous sequence, produces the death and without
8           which the death would not have occurred.

9  People v. Catlin, 26 Cal. 4th 81, 155 (2001) (quoting CALJIC Nos. 8.55 and 8.58).  "[A]s long as

10 the jury finds that without the criminal act the death would not have occurred when it did, it need

11 not determine which of the concurrent causes was the principal or primary cause of death."  Id.

12 "Rather, it is required that the cause was a substantial factor contributing to the result."  Id.  This

13 is true even if the victim's preexisting physical condition was a substantial factor causing death.

14 Id.  "So long as a victim's predisposing physical condition, regardless of its cause, is not the only

15 substantial factor bringing about his death, that condition . . . in no way destroys the

16 [defendant's] criminal responsibility for the death."  Id. (quoting People v. Stamp, 2 Cal. App. 3d

17 203, 210 (1969) (other citations omitted.)  Further, "[w]hen a person inflicts a wound on another

18 which is dangerous, or calculated to destroy life, the fact that the negligence, mistake, or lack of

19 skill of an attending physician or surgeon contributes to the death affords no defense to a charge

20 of homicide."  People v. McGee, 31 Cal. 2d 229, 240 (1947).  See also People v. Roberts, 2 Cal.

21 4th 271, 312 (1992) ("If a person inflicts a dangerous wound on another, it is ordinarily no

22 defense that inadequate medical treatment contributed to the victim's death").[18]

23 /////

24

25      [18]  In Roberts the California Supreme Court also held that "when medical treatment is
       grossly improper, it may discharge liability for homicide if the maltreatment is the **sole cause** of
26      death and hence an unforeseeable intervening cause."  2 Cal. 4th at 312 (emphasis added).
       However, that situation is not presented here.

1    Viewing the evidence in the light most favorable to the verdict, the undersigned

2  concludes that there was sufficient evidence introduced at petitioner's trial from which a rational

3  trier of fact could have found beyond a reasonable doubt that petitioner "caused" the death of Mr.

4  Bell, as that term is defined by California law.  Although it is theoretically possible that the

5  victim's behavior contributed to or hastened his own death, the evidence introduced at trial

6  reflected that petitioner's actions were a substantial factor in Bell's demise.  Without the gunshot

7  wound inflicted by petitioner, Mr. Bell's death would not have occurred when it did.  Further,

8  notwithstanding petitioner's speculation to the contrary, there is no evidence before this court

9  that medical malpractice had anything to do with Bell's death.

10    The state court's denial of relief with respect to petitioner's insufficient evidence

11  claim is not an objectively unreasonable application of <u>Jackson</u> and <u>Winship</u> to the facts of the

12  case.  Accordingly, petitioner is not entitled to habeas relief on his claim that the evidence

13  introduced at his trial was insufficient to support the jury's finding that petitioner's actions were

14  the cause of the victim's death.

15    C.  <u>Judicial Bias</u>

16    Petitioner claims that his right to a fair trial was violated because the trial judge

17  was biased against him.  (Second Am. Pet. at 30.)  As evidence of bias, petitioner cites several

18  trial court rulings.

19    First, petitioner notes that the trial judge denied a defense motion for a mistrial

20  after a prosecution witness improperly mentioned that an anonymous tip left on a police officer's

21  telephone answering machine stated that a vehicle with Colorado license plates had been seen at

22  the scene of the shooting.  (<u>Id.</u> at 31.)  The trial judge opined that any error was harmless, even

23  though the jury had received information that petitioner's vehicle had Colorado license plates.

24  (<u>Id.</u> at 31-32.)  Petitioner points out that this error led the judge at his first trial to declare a

25  mistrial.  (<u>Id.</u> at 32.)

26  /////

Second, petitioner notes that the trial judge also denied a defense motion for sanctions against the prosecutor for failing to turn over exculpatory evidence to the defense.  (Id.) Instead of imposing sanctions, the judge simply ordered the prosecution to supply the discovery material in question to petitioner's counsel.  (Id.)  Petitioner argues that "the judge's failure to issue any meaningful sanction against the Prosecution for their failure to comply with Petitioner's discovery order is also demonstrative of the Judge's bias against Petitioner."  (Id.)

Third, petitioner notes that the trial judge denied his motion for a mistrial, in which his counsel argued that the prosecution had failed to provide the defense with a photo line-up that was allegedly shown to victim Bell in the hospital, despite a discovery ruling requiring that any such evidence be turned over.  (Id. at 33.)  The trial judge denied this defense motion for a mistrial on the ground that petitioner did not suffer prejudice from the failure to obtain the lineup information in discovery.  (Id)  Petitioner argues that the judge's ruling in this regard "again demonstrated his bias against Petitioner."  (Id.)

Fourth, petitioner notes that the trial judge denied his motion for a new trial which was based on the ground that part of the testimony of one prosecution witnesses was taken before petitioner had entered the courtroom.  (Id.)  In this regard, petitioner argues that his absence during "a critical stage of the trial" prejudiced his defense.  He contends that the trial court's decision "to allow the testimony to go forward was additional evidence of his bias against the Petitioner."  (Id. at 34.)

Fifth, petitioner notes that the trial court also denied his motion for a new trial that he based on the grounds of ineffective assistance of counsel, even though the trial court stated on the record that petitioner's trial counsel erred in failing to fully investigate the victim's criminal background, history of violence and substance abuse.  (Id.)  Petitioner argues that this ruling by the trial judge "was evidence of judicial bias against Petitioner."  (Id.)

Finally, petitioner notes that the trial judge "denied Petitioner's assertion of privilege of marital communications between he and his spouse Deborah Allen," and "upheld the

1    Prosecution's motion to introduce evidence at trial that Petitioner had remarried Deborah Paiva

2    after Petitioner had been taken into custody." (Id. at 34-35.)  Petitioner argues that he suffered

3    prejudice as a result of each of these rulings.  (Id.)

4            1.  Procedural Default

5            Petitioner raised his claim of judicial bias for the first time in his habeas petition

6    filed in the Sacramento County Superior Court.  (Resp't's Lod. Doc. 7.)  Citing In re Harris, 5

7    Cal. 4th 813, 829 (1993), In re Dixon, 41 Cal. 2d 756, 759 (1953), and In re Waltreus, 62 Cal. 2d

8    218, 225 (1965), the Superior Court denied the petition on the grounds that the claim "could have

9    been raised on appeal but [was] not." (Resp't's Lod. Doc. 8.)  The California Court of Appeal

10   and the California Supreme Court summarily denied relief with respect to this claim in response

11   to subsequently filed habeas petitions.  (Resp't's Lod. Docs.  9, 10, 11, 12.)  Respondents argue

12   that the ruling of the Sacramento County Superior Court constitutes a procedural bar which

13   precludes this court from addressing the merits of petitioner's claim of judicial bias.  (Answer at

14   24.)

15           State courts may decline to review a claim based on a procedural default.

16   Wainwright v. Sykes, 433 U.S. 72, 81-82 (1977).  As a general rule, a federal habeas court "'will

17   not review a question of federal law decided by a state court if the decision of that court rests on

18   a state law ground that is independent of the federal question and adequate to support the

19   judgment.'" Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996)

20   (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).  The state rule for these purposes is

21   only "adequate" if it is "firmly established and regularly followed."  Id.  (quoting Ford v.

22   Georgia, 498 U.S. 411, 424 (1991)).  See also Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir.

23   2003) ("[t]o be deemed adequate, the state law ground for decision must be well-established and

24   consistently applied.")  The state rule must also be "independent" in that it is not "interwoven

25   with the federal law." Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan

26   v. Long, 463 U.S. 1032, 1040-41 (1983)).  Even if the state rule is independent and adequate, the

34

1   claims may be reviewed by the federal court if the petitioner can show:  (1) cause for the default

2   and actual prejudice as a result of the alleged violation of federal law; or (2) that failure to

3   consider the claims will result in a fundamental miscarriage of justice.  Coleman, 501 U.S. at

4   749-50.

5            A reviewing court need not invariably resolve the question of procedural default

6   prior to ruling on the merits of a claim where the default issue turns on difficult questions of state

7   law.  Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); see also Busby v. Dretke, 359 F.3d

8   708, 720 (5th Cir. 2004).  Under the circumstances presented here, this court finds that

9   petitioner's claim can be resolved more easily by addressing it on the merits.  Accordingly, this

10  court will assume that petitioner's claim is not procedurally defaulted.

11            2.  Merits of Petitioner's Claim of Judicial Bias

12            There are two ways in which a petitioner may establish that he has been denied his

13  constitutional right to a fair hearing before an impartial tribunal.  First, the proceedings and

14  surrounding circumstances may demonstrate actual bias on the part of the adjudicator.  See

15  Taylor v. Hayes, 418 U.S. 488, 501-04 (1974).  In other cases, the adjudicator's pecuniary or

16  personal interest in the outcome of the proceedings may create an appearance of partiality that

17  violates due process, even without any showing of actual bias.  Gibson v. Berryhill, 411 U.S.

18  564, 578 (1973); see also Exxon Corp. v. Heinze, 32 F.3d 1399, 1403 (9th Cir. 1994) ("the

19  Constitution is concerned not only with actual bias but also with 'the appearance of justice'").

20  There is no evidence in this case that the trial judge had a personal or pecuniary interest in the

21  outcome of the proceedings involving petitioner.  Accordingly, the court will analyze whether the

22  circumstances of petitioner's trial demonstrate actual bias on the part of the judge.

23            To succeed on his judicial bias claim, petitioner must "overcome a presumption of

24  honesty and integrity in those serving as adjudicators."  Withrow v. Larkin, 421 U.S. 35, 47

25  (1975).  He must also show that the trial judge "prejudged, or reasonably appears to have

26  prejudged, an issue."  Kenneally v. Lungren, 967 F.2d 329, 333 (9th Cir. 1992) (quoting

35

1   Partington v. Gedan, 880 F.2d 116, 135 (9th Cir. 1989) (Reinhardt, J. concurring and

2   dissenting)).  Bias can "almost never" be demonstrated solely on the basis of a judicial ruling.

3   Liteky v. United States, 510 U.S. 540, 555 (1994).  A judge's remarks or opinions will not

4   demonstrate bias unless they "reveal such a high degree of favoritism or antagonism as to make

5   fair judgment impossible."  Id.  On habeas review, the applicable standard is a stringent one:

6   relief is warranted only if "the state trial judge's behavior rendered the trial so fundamentally

7   unfair as to violate federal due process under the United States Constitution."  Duckett v.

8   Godinez, 67 F.3d 734, 740 (9th Cir. 1995).

9            Here, petitioner has failed to establish a due process violation resulting from

10  judicial bias.  There is no evidence the trial judge's rulings were the result of favoritism to the

11  prosecution or antagonism towards petitioner, or that the judge had prejudged any issue.  Aside

12  from the rulings themselves, petitioner points to no evidence in the record indicating that the trial

13  judge harbored any bias against him.  Petitioner has failed to overcome the presumption of

14  honesty and integrity on the part of the trial judge.  Accordingly, petitioner is not entitled to

15  habeas relief with respect to this claim.

16            D.  Failure to Disclose Exculpatory Evidence to the Defense

17            Petitioner claims that the prosecutor violated his right to a fair trial by failing to

18  produce two pieces of exculpatory evidence to the defense.  The first such item is a photo line-up

19  that was prepared by the police.  Petitioner explains that his trial counsel made a discovery

20  request for "all relevant and exculpatory evidence."  (Second Am. Pet. at 35.)  Apparently, the

21  prosecutor responded to this discovery request by stating that evidence of a photo lineup "did not

22  exist."  (Id.)  However, at petitioner's trial, Detective Buck testified that the day before his

23  testimony he discovered a photo lineup ("six color photos on one sheet") in his binder, that had

24  been turned backwards, and that he "didn't pay attention to until I pulled out the notes."  (RT at

25  1372.)  Detective Buck then told the prosecutor about this evidence, and it was immediately

26  disclosed to the court and to the defense.  (Id. at 1372-73.)  Buck further testified that he had not

1  previously informed the prosecutor about the photo lineup sheet because it had "slipped [his]

2  mind." (Id.)  Petitioner's trial counsel cross-examined Detective Buck about the circumstances

3  surrounding the assembly of the photo-lineup.  (Id. 1370.)  Beck testified that the photo-lineup

4  was never shown to any witness.  (Id. at 1373, 1381.)

5          Petitioner's trial counsel subsequently made a motion for mistrial based, in part,

6  on the failure of the prosecution to provide evidence of the photo lineup to the defense during the

7  discovery process.  (Id. at 1723-27.)  The trial court denied the motion for a mistrial, ruling as

8  follows:

9          For purposes of your incorporating on the motion for a mistrial that
           you've been prejudiced because of the late discovery of
10         Defendant's Exhibit L (the photo lineup), it was an error on the
           part of the police and the prosecution not to get it to you earlier,
11         but now that we know what we know about it, you weren't
           prejudiced in any way because it was never used and never shown
12         to the victim or anyone else, and that's my finding.

13  (Id. at 1728.)[19]

14          The other piece of evidence underlying petitioner's <u>Brady</u> claim is the audiotape

15  of an interview of Mary Roberson, the mother of the victim.  Petitioner claims, without

16  elaboration, that the audiotape "contained valuable information that could have been used to

17  impeach or bolster the credibility of this witness."  (Second Am. Pet. at 36.)

18          The state court record reflects that during petitioner's trial his counsel informed

19  the court that, despite a discovery request, he had not received the taped interview of Mary

20  Roberson.  (RT at 1461-62.)  The trial judge directed the detective to locate the tape and supply it

21  to the defense "so you folks can listen to it and see what importance, if any, it has."  (Id. at 1462.)

22  The tape recording was then made available to the defense the next day and petitioner's trial

23

24          [19]  In its opinion affirming petitioner's judgment of conviction, the California Court of
       Appeal stated that Deborah testified Mr. Bell told her at the hospital that the police had showed
25     him a photographic lineup but he did not see petitioner's photo in that lineup.  (Opinion at 14.)
       In denying petitioner's motion for mistrial, however, the trial judge found that the photo lineup
26     was never shown to any witness.  Petitioner does not challenge the trial court's factual finding in
       this regard in either the second amended petition or his traverse.

1   counsel actually received the tape four days later, after the weekend recess.  (Id. at 1558.)

2   However, petitioner and his counsel had already received the written report of Roberson's

3   interview.  (Id. at 1771-72.)

4                 Petitioner's trial counsel subsequently moved for a mistrial based, in part, on his

5   failure to receive the tape recording of the Roberson interview in a timely manner.  (Id. at 1734.)

6   Petitioner's trial counsel apparently believed that "everything that Mary Roberson claimed

7   Deborah Allen told her may have . . . been told to Mary Roberson by . . . Mary's sister, who may

8   have claimed to have heard it from Deborah."  (Id. at 1735.)  Petitioner's counsel also wanted to

9   find out whether "Deborah Allen ever told anybody anything in truth specifically."  (Id. at 1737.)

10  Prior to ruling on the defense motion for a mistrial, the trial court listened to the tape of

11  Roberson's interview and conducted a hearing to determine whether petitioner had suffered any

12  prejudice from his failure to receive the tape recording earlier.  (Id. at 1734-72.)  Ms. Roberson

13  testified at that hearing, confirming that Deborah Allen had made the statements at issue directly

14  to her and not to her sister.  (Id. at 1759.)  After hearing the testimony and the arguments of

15  counsel, the trial court denied the defense motion for a mistrial, ruling as follows:

16          I am satisfied that the report authored by Detective Overton
            significantly and accurately enough detailed the information Miss
17          Roberson gave Detective Overton on the phone which he recorded
            which the defense was not provided a copy of until the last couple
18          days I guess it was and that the argued prejudice by [petitioner's
            trial counsel] concerning how it has prejudiced him and the
19          defendant's presentation of the case is not sufficient to justify any
            granting of a motion for mistrial and, in fact, apparently neither
20          side is intending to call Miss Roberson for any purpose in front of
            the jury having learned what was on the tape in comparison with
21          what was in Detective Overton's report.

22          I suppose you're – either one of you are free to change your
            decision in that regard, and even if either side wanted to present
23          her as a witness based on this newly disclosed tape of the phone
            conversation, the defense has not been prejudiced to any extent that
24          would require a granting of a motion for mistrial.

25  (Id. at 1771-72.)

26  /////

1          1. Procedural Default

2          Petitioner raised this Brady claim for the first time in his habeas petition filed in

3  the Sacramento County Superior Court. (Resp't's Lod. Doc. 7.) Citing In re Harris, 5 Cal. 4th

4  813, 829 (1993), In re Dixon, 41 Cal. 2d 756, 759 (1953), and In re Waltreus, 62 Cal. 2d 218,

5  225 (1965), the Superior Court denied the petition on the grounds that the claim "could have

6  been raised on appeal but [was] not." (Resp't's Lod. Doc. 8.) Respondents argue that the ruling

7  of the Sacramento County Superior Court constitutes a procedural bar which precludes this court

8  from addressing the merits of petitioner's Brady claim. (Answer at 28.) The court finds that

9  petitioner's claim can be resolved more easily by addressing it on the merits. Accordingly, this

10  court will assume that petitioner's claim is not procedurally defaulted.

11          2. Merits of Petitioner's Brady Claim

12          The United States Supreme Court has held "that the suppression by the

13  prosecution of evidence favorable to an accused upon request violates due process where the

14  evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

15  the prosecution." Brady v. Maryland, 373 U.S. 83, 87 (1963). See also Youngblood v. West

16  Virginia, 547 U.S. 867, 869 (2006) ("A Brady violation occurs when the government fails to

17  disclose evidence materially favorable to the accused"). The duty to disclose such evidence is

18  applicable even though there has been no request by the accused, United States v. Agurs, 427

19  U.S. 97, 107 (1976), and encompasses impeachment evidence as well as exculpatory evidence.

20  United States v. Bagley, 473 U.S. 667, 676 (1985). There are three components of a Brady

21  violation: "[t]he evidence at issue must be favorable to the accused, either because it is

22  exculpatory, or because it is impeaching; the evidence must have been suppressed by the State,

23  either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S.

24  263, 281-82 (1999). See also Banks v. Dretke, 540 U.S. 668, 691 (2004); Silva v. Brown, 416

25  F.3d 980, 985 (9th Cir. 2005). In order to establish prejudice, petitioner must demonstrate that

26  "'there is a reasonable probability' that the result of the trial would have been different if the

39

1    suppressed documents had been disclosed to the defense." Strickler, 527 U.S. at 289.  "The

2    question is not whether petitioner would more likely than not have received a different verdict

3    with the evidence, but whether "in its absence he received a fair trial, understood as a trial

4    resulting in a verdict worthy of confidence." Id. (quoting Kyles v. Whitley, 514 U.S. 419, 434

5    (1995)).  See also Silva, 416 F.3d at 986 ("a Brady violation is established where there 'the

6    favorable evidence could reasonably be taken to put the whole case in such a different light as to

7    undermine confidence in the verdict.'")  Once the materiality of the suppressed evidence is

8    established, no further harmless error analysis is required.  Kyles, 514 U.S. at 435-36; Silva, 416

9    F.3d at 986.

10            The last reasoned decision on petitioner's Brady claims is the ruling by the trial

11   court in response to petitioner's motion for a mistrial.  Accordingly, this court will analyze the

12   trial court's  decision as the relevant state-court determination under AEDPA.  See Taylor v.

13   Maddox, 366 F. 3d 992, 999 n.5 (9th Cir. 2004).  In denying his mistrial motion, the trial court

14   concluded that petitioner did not suffer any prejudice from the prosecutor's failure to turn over

15   the photo lineup because it had not been shown to Mr. Bell or any other witness.  Under these

16   circumstances, petitioner's failure to receive the lineup earlier could not have had a negative

17   impact on his defense.  Similarly, the fact that neither the prosecutor nor the defense called Ms.

18   Roberson to the witness stand to correct any testimony given at petitioner's trial would appear to

19   eliminate the possibility of prejudice stemming from petitioner's failure to receive the tape

20   recording of Roberson's police interview earlier.  Certainly, petitioner has failed to explain any

21   prejudice resulting from his failure to receive this tape recording in a more timely fashion and the

22   court can perceive none.  In short, petitioner has not established a reasonable probability that the

23   result of the trial would have been different if the photo lineup or tape recording had been

24   disclosed to the defense in a more timely fashion.  Accordingly, petitioner is not entitled to

25   federal habeas relief with respect to this claim.

26   /////

40

1       E.  <u>New Evidence</u>

2           In his final claim, petitioner alleges that the declaration of defense investigator

3  Rick von Geldern supports his claims of judicial bias and ineffective assistance of trial counsel.

4  (Second Am. Pet. at 36.)  These allegations do not state a separate cognizable claim for federal

5  habeas relief.  The court has considered the declaration of Mr. von Geldern in connection with

6  petitioner's other claims and has concluded that it fails to support the granting of federal habeas

7  relief on any claim.

8       F.  <u>Evidentiary Hearing</u>

9           Finally, petitioner has requested an evidentiary hearing on his claims.  (Second

10  Am. Pet. at 37.)  Pursuant to 28 U.S.C. § 2254(e)(2), an evidentiary hearing is appropriate under

11  the following circumstances:

12       (e)(2) If the applicant has failed to develop the factual basis of a
          claim in State court proceedings, the court shall not hold an
13       evidentiary hearing on the claim unless the applicant shows that-

14           (A) the claim relies on-

15           (i) a new rule of constitutional law, made retroactive to cases on
           collateral review by the Supreme Court, that was previously
16           unavailable; or

17           (ii) a factual predicate that could not have been previously
           discovered through the exercise of due diligence; and
18

19           (B) the facts underlying the claim would be sufficient to establish
           by clear and convincing evidence that but for constitutional error,
           no reasonable fact finder would have found the applicant guilty of
20           the underlying offense[.]

21           Under this statutory scheme, a district court presented with a request for an

22  evidentiary hearing must first determine whether a factual basis exists in the record to support a

23  petitioner's claims and, if not, whether an evidentiary hearing "might be appropriate."  <u>Baja v.</u>

24  <u>Ducharme</u>, 187 F.3d 1075, 1078 (9th Cir. 1999).  <u>See also</u> <u>Earp v. Ornoski</u>, 431 F.3d 1158, 1166

25  (9th Cir. 2005); <u>Insyxiengmay v. Morgan</u>, 403 F.3d 657, 669-70 (9th Cir. 2005).  A petitioner

26  requesting an evidentiary hearing must also demonstrate that he has presented a "colorable claim

1   for relief." <u>Earp</u>, 431 F.3d at 1167 (citing <u>Insyxiengmay</u>, 403 F.3d at 670, <u>Stankewitz v.</u>

2   <u>Woodford</u>, 365 F.3d 706, 708 (9th Cir. 2004) and <u>Phillips v. Woodford</u>, 267 F.3d 966, 973 (9th

3   Cir. 2001)).  To show that a claim is "colorable," a petitioner is "required to allege specific facts

4   which, if true, would entitle him to relief."  <u>Ortiz v. Stewart</u>, 149 F.3d 923, 934 (9th Cir. 1998)

5   (internal quotation marks and citation omitted).

6          The court concludes that no additional factual supplementation is necessary in this

7   case and that an evidentiary hearing is not appropriate with respect to the claims raised in the

8   instant petition.  The facts alleged in support of these claims, even if established at a hearing,

9   would not entitle petitioner to federal habeas relief.  Therefore, petitioner's request for an

10  evidentiary hearing should be denied.

11                              CONCLUSION

12         Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

13  a writ of habeas corpus and his request for an evidentiary hearing be denied.

14         These findings and recommendations are submitted to the United States District

15  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

16  one days after being served with these findings and recommendations, any party may file written

17  objections with the court and serve a copy on all parties.  Such a document should be captioned

18  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

19  shall be served and filed within seven days after service of the objections.  The parties are

20  advised that failure to file objections within the specified time may waive the right to appeal the

21  District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

22  DATED: January 26, 2010.

23

24                                    _____
                                      Dale A. Drozd
25  DAD:8                              DALE A. DROZD
    allen1923.hc                       UNITED STATES MAGISTRATE JUDGE
26